and we'll turn to the last case on our day calendar today which is Labor Council for Latin American Development et al versus EPA number 19-1042, etc. Thank you, your honor. May it please the court, I'm John Kelmuth-Kent, arguing for petitioner Labor Council for Latin American Advancement and the other environmental and labor petitioners. Petitioners challenge EPA's partial ban on methylene chloride, a deadly chemical used in paint stripping products. The challenged rule bans consumer uses of methylene chloride paint strippers, but it fails to protect the workers who have the greatest exposures, who are dying in the greatest numbers, and who according to EPA face the greatest risks from their daily use of those products. In fact, EPA removed proposed protections for workers from its final rule, despite the uncontested fact that commercial uses of methylene chloride paint strippers present unreasonable risk, and the longer that those uses go unregulated, the more workers and bystanders are likely to die. This exclusion renders the rule arbitrary, capricious, and contrary to the Toxic Substances Control Act, or TSCA. Before addressing the arguments. EPA claims that its exclusion of workers from the methylene chloride rule is non-final, and the petitioner's claims are unright, because EPA plans to regulate commercial uses of methylene chloride paint strippers in a separate future rule, based upon a recently completed risk evaluation. EPA claims the second rulemaking process, which has not been formally commenced and need not be completed for up to three years, provides the relief that petitioners are seeking from this court. It does not, and that's because methylene chloride is acutely lethal. It can kill in as little as 10 minutes. So by the time that EPA completes a new rulemaking process, tens of thousands of workers and bystanders will have been needlessly exposed to a deadly chemical. Many will have already suffered serious, potentially irreparable harm, because of the commercial exclusion in EPA's 2019 rule. These are not academic or abstract concerns. The last time that EPA dragged its feet on methylene chloride and waited two years to finalize its consumer use ban, several people died as a result, including the sons of two of the individual petitioners herein. So the question before the court is not whether EPA must regulate commercial paint strippers at some point in the future. Instead, it is whether it was arbitrary, capricious, and unlawful for EPA, knowing that commercial uses of methylene chloride paint strippers present unreasonable risk, to exclude those uses from its March 2019 ban. And that decision is final under the Supreme Court's two-part Bennett v. Spear test. The challenged rule complements a multi-year decision-making process concerning which uses of methylene chloride paint strippers would be and would not be immediately banned. It has legal and practical consequence for thousands of workers who EPA left exposed to a lethal chemical. And a multi-year delay in regulation would cause severe hardship to those workers, and that hardship standing alone is sufficient to render petitioners' claims ripe. On the whenever EPA chooses to regulate a chemical based upon a pre-2016 risk assessment, as EPA has done here, the rule must be consistent with the scope of the assessment, and it must eliminate the unreasonable risks identified therein. Here, EPA unlawfully left the most severe and unreasonable risks in its 2014 risk assessment unregulated, and those are the risks to workers and bystanders from commercial uses of methylene chloride paint strippers. EPA claims it did not regulate those uses in the methylene chloride rule because that rule does not contain a formal finding that commercial uses present unreasonable risks. That is simply not credible. In fact, EPA made an unreasonable risk determination for consumer uses in its methylene chloride rule based upon the 2014 risk assessment. Now, that same risk assessment found that for every health effect that EPA considered, central nervous system effects, risk of cancer, sudden death, commercial uses of methylene So, if consumer uses present unreasonable risks that warrant immediate regulation under TSCA, as EPA correctly found in the challenged rule, then commercial uses necessarily do as well. And as this court found in Physicians Committee for Responsible Medicine v. Johnson, EPA cannot excuse itself from TSCA's rulemaking mandate through the failure to make formal findings that are supported by the record. Finally, the exclusion of workers from the But most fundamentally, EPA has now provided any reasoned explanation for its decision to leave workers exposed to unreasonable risks. EPA talks about regulating commercial uses of methylene chloride based upon the 2020 risk evaluation, but that risk evaluation did not contain new analyses of commercial paint strippers. Instead, EPA then copied and pasted verbatim the analyses from its 2014 risk assessment, and it relied upon those to make its finding of unreasonable risks. EPA also claims that it wanted to solicit comment on a different means of regulating commercial uses of methylene chloride, a worker training and certification program. But EPA had already considered, solicited comment on, and rejected that very option as unfeasible in its 2017 proposed rule, and EPA has not identified any new facts that cast doubt upon those prior statements. To close, EPA has known for at least seven years that methylene chloride paint strippers present unreasonable risk to workers, and it is known for at least four years that a commercial use ban was needed, yet the agency unlawfully allowed those risks to persist, and now it seeks another several years to address them. Given the severe, imminent, and uncontested nature of the harm in this case, there is no basis for further delay. And with that, I'm happy to accept any questions that the court has. What would you have the court rule? Your Honor, we would have this court immediately remand the 2019 rule so that EPA can address the commercial risks posed by methylene chloride, or sorry, the risks posed by commercial uses of methylene chloride. So it is petitioner's contention that those risks were required to be addressed in that rule, as opposed to in a separate future rulemaking, and that there is no legal or scientific basis for another several years of delay. We're asking this court to remand and to direct EPA to finalize rules of commercial uses of methylene chloride paint strippers within six months. Thank you. This is Judge Cabrera. I recognize that in the administrative process, especially at EPA, everyone has standing, I gather. Trees have standing, as we know, since Professor Christopher Stone's famous article. But who are you representing here in the Labor Council for Latin American Development? Are you representing people who are in Latin America? No, Your Honor. I don't find any explanation of this. Your Honor, it's in the standing declarations that were appended to our opening brief. The Labor Council for Latin American Advancement represents workers that work within the United States in a range of trades, and in particular, Latino and Latina workers. And those workers include workers who use paint strippers on the job. And two facts that are critical here, EPA has acknowledged in its proposed rule that Latino and Latina workers face disproportionate impacts for methylene chloride paint strippers, because they are overrepresented in the construction trades and the paint stripping trades in the fields that are most likely to use these chemicals. LAFLA represents those workers who are left exposed. I see. Okay. Judge Cabrera, I have a question or two before you move on. Counsel, can you tell me what you identify as the final decision here that allows you to appeal? Yes, Your Honor. The final decision that we are challenging is EPA's March 2019 rule regulating methylene chloride paint strippers. And that rule was based upon a 2014 risk assessment, which evaluated both commercial and consumer uses of those paint strippers and found unreasonable risks from both commercial and consumer uses. And then in its proposed rule, EPA proposed a ban on both commercial and consumer uses. So it's the, you don't have to explain it to me. It's the EPA's 2019 decision. Now, we do have the decision also in 2019 to retract this rulemaking onto a newer statutory framework. And I would like to know why you don't think that, that that leaves us with a non-justiciable circumstance here. Your Honor, because it is our contention that EPA was required to regulate commercial uses of methylene chloride paint strippers in the 2019 rule. And the fact that EPA may commence a court of jurisdiction. I think that the facts are somewhat analogous to the Sierra Club v. Gorsuch case, which we cite in our reply brief on page 10. And there you had an EPA rulemaking under the Clean Air Act that added certain categories to Clean Air Act regulation. And EPA did not include strip mines. The Sierra Club challenged that omission. And they said, we think that the statute and the record here requires you to include strip mines on this list. EPA's response was the same response that it's given up here. They said, we haven't completed our decision-making process with respect to strip mines. We're still gathering additional information. We intend to regulate that in the future. And the DC Circuit found that the Sierra Club's claims were right and that the decision was final. And the reasoning given was the Sierra Club was not challenging whether EPA had to do that in the future. The Sierra Club was saying, given the statute and given the record before the agency, it was unlawful and arbitrary and capricious for EPA to fail to do that in the rule that it had finalized, which is exactly- Right. There's no question that in late 2019, there was a new statutory framework, right? Your Honor, TSCA was amended in 2016. And- Right. They were now going to retract this rulemaking onto that framework, which does obligate it to propose a rule on commercial use by June 2021 and to finalize the rule by June 2022, correct? No, Your Honor. I do not believe that is correct. And if I can address both first, the kind of interplay between these two processes and then the timing. Well, ultimately, what I want you to talk about is how the relief you want from this court is going to benefit you in a way that is not achieved by what they are proposing to do, which is to retract onto the new statutory framework. Gladly, Your Honor. And if I can begin by describing, I think you're right. There are two tracks available under TSCA, but I disagree with the kind of characterization that EPA somehow retracted its use of the prior risk assessment. Methylene chloride was assessed by EPA prior to the 2016 TSCA amendment. When Congress amended TSCA, it said for those chemicals that had been previously assessed, EPA can do one of two things. It can either issue a rule based upon the prior risk assessment, or it can start again from scratch and conduct a new risk evaluation. With respect to methylene chloride, EPA chose- A little slower, Counselor, because it's hard to understand. You're a little slower. Sorry. With respect to methylene chloride paint strippers, which had been previously assessed, EPA chose the former track. It chose to issue regulations based upon its pre-2016 risk assessment. And in doing so, it was required under TSCA section 26L4 to issue rules that were consistent with the scope of the risk assessment and that eliminated the unreasonable risk identified therein. And EPA went through a full rulemaking process and it finalized that process in the March 2019 rule, but it did so in a manner that violates those requirements of TSCA. And what EPA is saying now is we cannot challenge that because EPA intends to undertake a new rulemaking based upon the 2020 risk evaluation. Your Honor, that risk evaluation, first of all, it relied on the same analyses and same data that EPA had conducted in the 2014 risk assessment. And second of all, it will not be complete, not in 2021 or 2022. There is a statutory option for EPA to extend those deadlines for a year and a half. So we can end up up to three and a half years from the final risk evaluation, which was last June, EPA had to finalize new rules. And in those three and a half years, as we mentioned, there are going to be tens of thousands of people that are exposed to a lethal chemical. You make that point. I understand. Yes. I have one last question for you. Are you familiar with the Supreme Court's decision of this morning in United States Fish and Wildlife about final agency decisions? I am familiar with it, Your Honor. I have quickly read that decision. I can't claim to be an expert on it. Well, there is language in there that what matters is not whether a document is the last one, but whether it communicates a policy on which the agency has settled, whether the agency treats the document as its final view on the matter. So can you tell me why we would conclude that the document you're talking about or the ruling you're talking about is being treated by the agency as its final word on the subject? Gladly, Your Honor. And first, I would like to note that that decision dealt with FOIA Exemption 5 and when documents can be withheld as deliberative. I don't think that it purported to address final agency action for the purpose of the court's jurisdiction. But here, our position is EPA has made a final decision concerning which uses of methylene chloride would be and would not be covered by its March 2019 rule. That decision was finally made when EPA published that rule in February. The fact that EPA may subsequently issue subsequent rules that address that does not change the finality of that decision. So our contention is that if EPA was required, both by the requirements of TSCA and by the uncontested evidence in the record, to address commercial uses of methylene chloride paint strippers in that rule, then the fact that there may be subsequent action taken in the future really does not divest the court of jurisdiction. And I think that's consistent with this court's holding in Salazar v. King, where the court said the possibility of further proceedings in an agency does not render a completed agency action non-final or beyond the scope of judicial review. I just want to be clear on which pronouncements you're relying on. I know there's the March 2019 ANPRM, but then there's the draft risk evaluation in October of 2019, which becomes a final risk evaluation in June of 2020. You're saying it's the March document that is the final document here? Is that what you're saying? Yes, Your Honor. However, it's not the ANPRM. At the completed its rulemaking based upon the 2014 risk assessment, EPA has made a determination of what it intends to regulate in that rule and what it does not intend to regulate in that rule. I thought it's only the 2020 final risk evaluation that triggers statutory rulemaking deadlines. Is that not right? No, Your Honor. EPA has the option of regulating under TSCA either based upon a 2016 risk assessment or a post-2016 risk evaluation, and here they chose the former. So once they chose to do that, they were required to issue a rule that complies with top of the section. All right. Well, I'll look forward to hearing from the government and then from you in rebuttal. Thank you for answering my questions. Thank you, Judge Cabranes. Judge Cabranes? Sorry, I was the old mute problem. Yes, we'll hear from Keith Bradley. Good afternoon. Oh, sorry. Pardon me. Good afternoon, and may it please the Court. I'm Keith Bradley representing the Halogenated Solvents Industry Alliance. Before EPA's rule, nearly half of commercial users of these paint strippers were furniture finishers. EPA found these users have no good substitutes for the product. Nothing else reliably strips antiques without damage. Many other trade people need the products too, the professional contractors who do painting and remodeling. You've probably seen their white vans on the way to jobs. For these users, losing access to the products is a severe impact on their business, and so too for the small businesses that make the products and formulate them for commercial use, members of HSIA. EPA did it anyway. He's listed the consequences in a careless afterthought that is a model of how not to make policy. I want to lay out four things for the users. The only company that could lawfully sell the products now is one that never sells and has never sold so much as a can of paint or laundry detergent to a single consumer. This is not an exaggeration. That's what the rule says, and EPA has not disavowed that reading. Second, in this rulemaking, EPA said it was only preventing consumer use. The impacts on commercial use could only be permissible on this record as a secondary consequence of something that is quote-unquote necessary as TSCA uses that term to protect consumers. Third, EPA made no real assessment of whether its draconian retailer ban is really necessary in that sense. What would have happened if EPA didn't include the ban? What will happen because of the ban? These are obviously key considerations. Fourth, EPA gave the public no opportunity for input on the retailer ban. They proposed to prohibit commercial use except for furniture or finishing and several other uses, and they proposed a limitation to 55-gallon drums. Neither of those is remotely the same as a rule that purports to allow commercial use but eliminates the supply network for the trades, including furniture or finishing. EPA's authority under TSCA is sweeping and powerful, but to go with it, Congress demanded particularly thorough and thoughtful decision-making. First, a heightened notice and comment requirement. EPA must comply with the ordinary EPA rules, plus, this is section 63, shall also state with particularity the reason for the proposed rule. So, section 105C says you can't sell the product to retailers. 105C says a retailer can't sell it. EPA's proposal did not, of course, state with particularity why it adopted these provisions. It's pretty clear EPA didn't even think of them until late in the day. Even under the ordinary APA standards, this court noted in Time Warner that the absence of comments on an issue is a strong signal that the public lacked notice of the concept. I submit that if we had had any idea EPA would do what it did, we certainly would have commented about the scope of what is a retailer. Second, EPA must, in deciding what to do, consider the reasonably ascertainable economic consequences of its rule, including its cost-effectiveness and its likely effect on small businesses. I urge the Court to study page 1023 in the Joint Appendix. That's the only place we've found and the only place the EPA has cited that discusses even potential consequences of the retailer ban. That paragraph is riddled with speculation. There might be a new market for specialty stores dedicated to commercial sales of methylene chloride paint strippers. They might sell in small quantities if that might be profitable. Some commercial users might switch to other products. EPA doesn't mention here its conclusion that furniture finishers actually can't. As an assessment of reasonably ascertainable economic consequences, this is fairly thin, and it is not enough given the impacts that common sense would readily reveal. We recognize the concern regarding consumer uses. If the Court grants the relief we ask, it will remain unlawful to sell methylene chloride paint strippers to a consumer. That will carry $37,000 civil penalties enforceable by private action, and potentially criminal penalties, too. We ask the Court simply to invalidate Sections 105B and C, which restrict non-consumer sales through this broadly defined retail channel. Thank you, and I'd like to answer any questions the Court has. Judge LaValle? I have no questions. Judge Rodgers? Nothing further. All right, we'll hear now from Ms. Buckley. Ms. Buckley? I'm sorry, Your Honor. I did the mute thing. Okay. Sarah Buckley on behalf of EPA. Yes. May it please the Court, at issue here is EPA's action to address the unreasonable risk presented by one type of activity, the consumer use of methylene chloride paint and coating removers. Labor Council and their colleagues tried to leverage that action on the risks presented by consumer use to compel action to address risks presented by another condition of use, the commercial uses of those paint strippers. While EPA has now determined that those uses do present unreasonable risk pursuant to the 2020 risk evaluation, nothing about acting on the consumer use risk, or nothing in TSCA itself, makes EPA's non-action with respect to consumer use in 2019 reviewable here. I'd like to start first, however, by addressing HSIA's claims that the rule addressing consumer use went too far. Not only is HSIA wrong that EPA did not adequately confront the costs of the consumer rule, but HSIA itself fails to confront the lack of record evidence that an alternative approach would meet EPA's responsibility to ensure that the unreasonable risk presented by those uses is no longer presented. Contrary to HSIA's characterization, EPA did consider costs just as TSCA directs, which specifically is to factor them in to the extent practicable, along with other considerations set out in section 2605, subparagraph A, 2605A to C2A. Contrary to HSIA's claim that the only place that EPA addressed those costs was on one page of the joint appendix. Throughout the economic assessment, which is available in the joint appendix, EPA addressed costs to commercial users. Another citation for that would be JA 928 to 29, to formulators. Another citation would be JA 952, 985, 995, and 1005 to retailers at JA 957, 1005, and to distributors at JA 960, 957. In some of those categories, EPA was able to quantify costs, and those costs where the data was reasonably ascertainable, the standard that Congress has set out in TSCA, EPA quantified the cost and discussed the cost in relative fashion between the two alternatives that it determined would address the unreasonable risk presented by those uses. In other circumstances where EPA was not able to quantify costs, EPA included a qualitative discussion of the expected costs, and nothing in TSCA requires more than that qualitative discussion. In doing that, EPA, again, kept with its fundamental responsibility to ensure that this use no longer presents the unreasonable risk identified. EPA's consideration of costs and the proper role of costs is also important to keep in mind with respect to HSIA's other contention that the fact that there are secondary effects on commercial use of paint and coating removers renders this action arbitrary and capricious. First, there's no such limitation found in the statute, and, indeed, Section 2605A directs EPA to select risk management requirements from a menu of options, which include, one selected here, prohibiting the distribution of a product for a particular use. That menu makes clear that, particularly for consumer uses, EPA will have to select some requirement that will have a secondary or indirect effect because EPA is not authorized to directly regulate or prohibit consumer use. Moreover, given that EPA's fundamental responsibility is to address the risk, it's not reasonable or logical to expect that you could do so without effect on anything but directly regulated use. For example, baby gates prevent small children from falling downstairs. They also impede adults when they're moving around the house. They, nevertheless, effectively address the risk for the one group that is targeted. HSIA also contends that it was internally inconsistent for EPA to say it was rejecting one option on the basis of its effect on commercial use but adopt another option that still has those effects, but it is not inconsistent to consider the cost of the regulatory options to users in the commercial space, just as Congress intended and as HSIA says that EPA is required to under TSCA. HSIA points to statements in EPA's assessment of costs about the secondary effects on commercial users, but certainly those effects and their magnitude are relevant to that cost weighing. However, it's important to remember that in 2016, Congress replaced the prior standard that EPA had to select the least burdensome requirements when regulating a chemical with the standard here today that it must select requirements that will regulate to the extent necessary so that the chemical or chemical substance or mixture no longer presents such risk. I'll briefly touch on HSIA's logical outgrowth argument as well. First, TSCA certainly sets out additional procedural requirements on top of the minimum set out in the APA, and one of those is to state with particularity the reason for the proposed rule. There is nothing from that statement or elsewhere in TSCA indicating that that changes the standard that should be applied in reviewing EPA's final rule. In fact, statutes that HSIA pointed to in its brief that include additional procedural requirements are regularly treated under the logical outgrowth standard on judicial review. Here, what EPA did was a logical outgrowth. The modification of the consumer use distribution ban to attend a clarification that these products could not be distributed by retailers is rational, and the agency's path may reasonably be discerned. The final rule is substantially the same as the proposal with this notable clarification, and I think contrasts sharply with many of the cases HSIA cites where the agency did a complete about-face. The retailer distribution prohibition is certainly directionally the same as what was proposed, and indeed responds to key issues that EPA highlighted in its proposed rule. First, that consumers access these products through the same distribution channel as commercial users, and thus to keep them out of consumer hands, EPA would need to cut off access at those distribution channels. In the proposed rule, the mechanism for doing so was also a supply line approach, which was to use the 55-gallon volume distribution restrictions in addition to both a consumer and commercial use distribution ban. The retailer distribution prohibition also answers the question, the challenge of implementability and enforcement, because EPA identified in the proposal that there is no mechanism to reliably identify consumer versus commercial purchasers. This is an effective way to ensure that these products don't get into consumers' hands by also placing the onus of implementation and enforcement on a smaller group of distributors and formulators rather than the thousands of retailers or many thousands, billions of consumers. In sum, the retailer provision effectuates the consumer distribution ban that was proposed and also ensures that EPA's requirements eliminate the identified unreasonable risk. In the proposal, EPA stated that just a consumer use distribution ban alone would not address the unreasonable risk, and HSA has not pointed to anything in the record that would support a contrary conclusion. I'll turn now back to Labor Council's arguments that the 2019 action on consumer uses marked the consummation of EPA's decision-making process for a different use. I think that the important question here is, what did that action in 2019 say? And what it said was it was promulgating requirements to address the unreasonable risk presented by the consumer use of these methylene chloride products. And it also said that the continuing... Let me interrupt you with a question. As you embark on this part of your argument, I'd like you to bear in mind and to answer this question. How can it be logical and reasonable to say that this product is unreasonably dangerous with respect to consumers, but at the same time is not unreasonably dangerous with respect to workers who are dealing with it from morning till night every single day of their work? How can that be so? Well, Your Honor, I don't know that it could be so. And in fact, EPA has since stated its conclusion that the consumer... I'm sorry, the commercial use of these products does present unreasonable risk. But the fact that both of those things are true, that consumer use presents unreasonable risk and commercial use presents unreasonable risk, does not mean that acting on consumer risk while exploring other risk management options for commercial risk is unreasonable. Labor Council indeed doesn't contend that the absence of action on the commercial renders the action on consumer use ineffective. The risks identified from that use are fully addressed by EPA's regulation here. And so the question is, what about the final action on those uses can create a requirement for EPA to have acted where we contend the statute creates no requirement? Labor Council tries to construe the 2019 rule as EPA's last word in a couple of ways. They say that the question that was final was whether EPA was going to regulate right then at that moment. And that's a de facto argument that EPA was declining to regulate or had decided not to regulate, drawn from the lack of action at that time. But inaction is only reviewable final agency action when it is the functional equivalent of action. That is, if EPA was to say, we won't regulate this use, we will affirmatively walk away from the process of regulating use. That's not what happened here. Both the statements in the record, the ANCRM, and EPA's risk evaluation process all show that EPA intended to address the risks presented by that use. It just was not finalizing it at that time. The judicial intervention at this point, finding reviewability, would disrupt this ongoing agency process. And this is a process that comes, that is exactly the process that how the decision unfolds through risk evaluation, proposed risk management, and final risk management. Petitioners will have the ability to enforce EPA's adherence to those deadlines through task of citizen supervision. And when EPA eventually does finalize a rule to address commercial risk, judicial review will be available at that point. All of these considerations also tie in with our argument that this action is not right. This clearly shows that the agency's policy on this point is not crystallized, and that judicial resources could be saved by avoiding premature adjudication at that, at this point. There are copious cases that endorse the idea that agencies may act partially or in a step-by-step fashion. The fact of the action on the one use, consumer uses, does not mean that the step not taken is concurrently reviewable with the step taken. Here, again, EPA's rule addresses unreasonable risk from consumer uses. It doesn't address just risk to consumers. That is, it didn't neglect exposures from the consumer uses in its analysis. And labor council doesn't contend that there are risks from consumer uses unaddressed here. But instead, it can address two types of uses in subsequent actions. The lack of action on one doesn't render the action taken arbitrary or capricious. Labor council's argument is essentially that if problems are closely related or similar enough, it can be arbitrary and capricious not to act. But that logic ignores the finality requirement of review of agency action. And it's also not necessarily logical. Both vaping and cigarette smoking present risks. But I don't think we would think it's inherently irrational for an agency to address the risk of vaping without concurrently addressing the risks of cigarettes. Finally, I'll quickly address labor council's argument that EPA was required by TSCA to act at the time on the commercial uses at the same time as the consumer uses. First, the section that EPA acted under 2625L4 plainly uses permissive language. It doesn't require the use of that alternative path to regulation for chemicals or all conditions of use covered by a particular risk assessment that was completed before the EPA to pick one path or the other to cover the entire scope of an existing risk assessment. Instead, the limitation about the scope of the risk assessment is best understood as saying, well, EPA, you can skip the new procedural and substantive requirements that we have developed for the risk evaluation process here in these limited cases, but your risk management rule cannot exceed the scope of these existing risk assessments. And acting on consumer use certainly didn't exceed that scope. Further, 2605A, the section addressing promulgation of risk management rules does have the language of requirement in saying that EPA shall regulate, but that applies to findings of unreasonable risk that come out of the new risk evaluation process under section 2605B. And that is not the path that EPA used here with respect to the 2019 rule. It's not the path that EPA is on now, and it's the reason why there will be judicially enforceable deadlines for EPA's risk management regulations following now that now follow as a result of the final risk evaluation. Labor Council has also pointed to the language that EPA's risk management rules must address the unreasonable risk as we have emphasized with respect to consumer use today. But that is a description of the substantive requirements of the rule that EPA does issue, and it does not mean that if there is unreasonable risk still outstanding, still unaddressed after EPA has acted on one condition of use and has stated it is acting on one discrete condition of use, that EPA's action is somehow arbitrary and capricious. With that, Your Honor, I will Thank you. No, thank you very much. answer your question. Judge LaValle, any questions? Not for the moment. Thank you. Judge Raji? No, thank you. The term... I have a very simple sort of question. These administrative law cases of this sort do not ordinarily come to us. Is this regulation currently under scrutiny by some other court of appeals? Not this particular regulation, Your Honor. There have been petitions for review filed to review the 2020 risk evaluation of methylene chloride, which addressed risks presented by a wide variety of conditions of use of methylene chloride, including the commercial paint and removal uses. Those have been consolidated in the Ninth Circuit. Ninth Circuit. And where in the Ninth Circuit is this now churning or percolating, as you say? Yes. Petitioners have filed their opening brief, and EPA's brief is due at the end of April. And you may have already answered this question, but to what extent does one... Do the issues presented here arise again in the Ninth Circuit case? None of the issues related to consumer use or restrictions on... Restrictions to address risks presented by consumer use, because that was not... The finding of unreasonable risk for those uses is embodied in the 2019 rule. It was not made in the 2020 risk evaluation. But the issues with respect to the risks presented by commercial use of methylene chloride and paint and coating removers is presented to a certain extent. Of course, not the questions of when regulation is required to happen. It's not of unreasonable risk for the commercial uses is that issue in those cases. Now, this whole subject has been before the EPA for a mere 35 years, as counsel has noted. Are we dealing here with anything that might be styled a final rule? I think your position is no, there is no final rule, right? Correct, Your Honor, in that there is no final rule with respect to the commercial uses. There is a final rule with respect to the risk presented by consumer use. I'm sorry, I didn't catch the last part. There is a final rule as to what? As to the risk presented by the consumer use of methylene chloride and coating remover. Thank you. Yes, okay. All right. So, Judge LaValle here, your position is then in view of the fact that, as you argue it, there is no final rule with respect to commercial uses. Your position is that this court is without jurisdiction under Article 3 to consider the question of commercial uses. Is that correct? No, Your Honor. The issue of whether finality is jurisdictional is somewhat fraught. Finality is seen as a required element of a claim, and without finality, there is no judicial review, because courts can only review agency actions that are final. So, our contention is that it's inappropriate because there is no final action, and also that the action is prudentially unripe for essentially the same reasons as it is not final. The prudential ripeness speaks to the same concerns that animate the finality requirement. Well, prudential unripeness, is that a constitutional doctrine, or are you talking about statutory unripeness? Isn't that an Article 3 consideration, prudential unripeness? The overlap of constitutional ripeness, where a plaintiff or petitioner would not have actually an imminent injury, or be able to demonstrate the injury element of decisionability and prudential ripeness are related, but not completely the same. So, your position is that it is unripe, and therefore we shouldn't adjudicate it, not because of Article 3, we don't need to reach that, but because of statutory restriction to judicial review in the case of final orders. Am I stating it correctly, that we do not have statutory authority to review an action that has not become a final action of the EPA? Is that correct? That is correct, although, so I guess I would point the court to some of the cases that we cite for prudential ripeness. I think the most apt case that I had highlighted for myself was American Petroleum Institute v. EPA at 683 F. 3rd 382, which described the court's prudential considerations in considering the two prongs of that doctrine that were originally established in the Supreme Court's decision in Abbott Lab. Those two prongs being whether the issues are fit for judicial review at this time, fitness in the case of agency action being a function of whether the court would be essentially drawn into deciding issues unnecessarily. And then the second prong of that would be hardship to the parties and whether the hardship to petitioners in having adjudication delayed outweighs the concerns found under the fitness prong. Well, as to hardship, Labor Council is arguing that countless numbers of its members and countless numbers of workers in commercial applications are going to be seriously sickened and or die during the time delay before the EPA reaches a final order with respect to commercial uses. What do you say about that? Well, Your Honor, I'd say that the essential problem, the first line problem we have is that there is no reviewable agency action that would address those concerns and that, two, the agency is actively working on regulations to address those harms, and it is a good idea to allow the agency, another branch of government, to consider the best way of addressing those harms and to give... When you say there is no reviewable decision, I thought you said just before that the potential harm in delay is one of the factors in deciding whether the current state of the record permits review. Yes, under the prudential... No, Your Honor, yes, that is one of the prongs of the prudential rightness doctrine. It is not, however, one of the prongs for finding that an action is final or not. Here, we would, I guess, assert that under the prudential rightness doctrine, the concerns under the fitness prong, which we think we can strongly demonstrate, that they outweigh any hardship that can be demonstrated. This is Judge Cabrera, at the risk of making you repeat yourself. What... Tell me again, what part of this rule, this... What do we call this, an interim rule? No, Your Honor, the 2019 action was a final rule. The scope of that final rule was addressing the unreasonable risk presented by the consumer use of paint and coating removal. Okay. The consumer use and the commercial use were separate conditions of use, and EPA separately, in the proposal and in the risk assessment, separately analyzed what risks were presented by those activities. Okay, so we have a species of final rule here, and what part of this, in your view, is prudentially ripe for adjudication by a court? I guess, just HSIA's challenges. That is, challenges related to the sufficiency, reasonableness, substantial evidence supporting the rule addressing consumer uses of these products. Okay. Thank you. I want to suggest to Judge Cabrera, in view of the fact that Judge Raggi pointed out that there is a new Supreme Court decision today, on at least vaguely related subject, whether we should ask the parties to give us a letter of brief on the pertinence of that new Supreme Court decision to this case? Yes, that would be a good idea. In fact, we should get a letter of brief from all counsel who have argued today regarding the Supreme Court decision of today, but also with respect to any adjudication of related issues or identical issues in any other circuit. We don't need a lot of information. We just need enough to enable us to do our own research, if necessary. If the letter could separate the two questions in the total of six pages, maximum, to be submitted simultaneously on one week from today, which would be March 11th. Does that seem reasonable to counsel? Yes, Your Honor. Great. It is so ordered, absent further comment. We do have a, Mr. Kalmuth-Katz and Mr. Bradley have reserved one minute, but let's stick to one minute quite definitely. Anything you want to add, Mr. Kalmuth-Katz? Yes, Your Honor. I'd like to return to this point about finality. The critical issue here is TSCA Section 26L4 is a distinct process that governs rules issued based upon risk assessment. EPA has issued only one rule and will issue only one rule based upon its 2014 methylene chloride risk assessment. That was the action that it finalized in 2019. The risk assessment, as EPA now concedes, found unreasonable risk from commercial uses. EPA chose not to address commercial uses in that rule. That is exactly what petitioners claim was unlawful, and this is the only time that petitioners have to raise that claim. The 2019 rule is final agency action with respect to the risk assessment and with respect to regulation under that risk assessment. If EPA did not comply with the requirements of TSCA Section 26L4, or if it issued a rule that is unsupported by the record, those claims can only be brought now and they would not be redressed by the subsequent issuance of a future rule based on a separate process, the risk evaluation process. They are distinct processes, Your Honor, and I do believe that we have final agency action with respect to the decisions made in the risk assessment, and just very briefly with respect to prudential rightness, which as opposing counsel has acknowledged is not constitutional, it's not jurisdictional, and in fact, according to the Supreme Court, is a disfavored means of resolving cases. Hardship factors heavily into that analysis, and I would just go back to Your Honor, the consumer ban on methylene chloride paint strippers, people died. There are tens of thousands of workers that are being exposed every year to this chemical. Telling those workers, wait another three years to address a problem that we should have addressed in 2019 is just not a legally or practically viable solution. So unless there are any additional questions, Your Honor, I will close with that. Thank you very much. Mr. Bradley, you want to take one minute to wrap it up? Thank you. EPA says that it considered the cost of this all. There's a lot of consideration of cost of something, but look hard, not of the retail band and what it would do to companies like furniture and finishers. The Baby Gates example is an interesting analogy. You never know where somebody might bring a baby, and so if you really wanted to make the risk to zero, you might mandate Baby Gates in bars, offices, car factories, and everywhere else. Would that go too far? Probably, and how you would decide is you'd have to think about how close to zero do you need to go and how much is it going to cost everybody else. TSCA calls for that same sort of evaluation here. EPA stresses that the statute used to call for the least burdensome method, and it doesn't anymore. It does not follow that the statute does not care about burden whatsoever. Finally, with respect to commercial versus consumer, there is a difference. EPA's recent risk assessment talks about the different kind of protective equipment that you might use and how that affects the risk, and sales places could just readily look to whether you've got a commercial account. I'll pause there if anybody has any questions. Thank you. Okay. Thank you all very much. We'll reserve decision, and we will adjourn. Item clerk? Court sents adjourn.